IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

BARBARA WACONDA, as Personal Representative
of the Estate of GLORIA LEON, Deceased,

       Plaintiff,

vs.                                                                    No. CIV 06-0101 JB/ACT

UNITED STATES OF AMERICA,
ST. VINCENT REGIONAL MEDICAL CENTER,
REBECCA BAIR, M.D., AVELINA BARDWELL, M.D.,
IRON EAGLE ENTERPRISES, f/k/a PMSA,
JOSEPH ARAGON, MD, NANETTE LOWE, MD and
STAFF CARE, INC., and PERSONNEL RESEARCH, INC.
d/b/a PMSA,

       Defendants.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on the United States' Motion to Dismiss Pursuant

to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) or, in the Alternative, Motion for Partial Summary Judgment

Pursuant to Fed. R. Civ. P. 56, filed October 19, 2006 (Doc. 64).  The Court held a hearing on this

motion on February 20, 2007.  The primary issues are: (i) whether federal law or New Mexico law

governs whether Defendant Joseph Aragon, M.D., and Michael Noce, M.D., were employees of the

federal government or employees of an independent contractor at the time they performed medical

services that Plaintiff Barbara Waconda alleges constituted medical malpractice; and (ii) whether,

under controlling law, Dr. Aragon and Dr. Noce were federal employees or employees of an

independent contractor.  Because the Court concludes that federal law controls whether a person is

a federal employee or an independent contractor, and because, under federal law, Dr. Aragon and

Dr. Noce were employees of an independent contractor at the time of the alleged negligence, the

Court will grant the United States' motion for summary judgment and dismiss the claims against the United States that are based on the alleged negligence of Dr. Aragon and Dr. Noce.

## FACTUAL BACKGROUND

While the parties dispute the materiality of some facts, Waconda does not dispute the facts contained in the United States' motion. <u>See</u> Transcript of Hearing at 7:13-17 (Sullivan)(taken February 20, 2007)("Transcript").[1]  Waconda acknowledges that, in resolving this motion, the Court's task is to "take the facts as [Waconda] and [the United States] agree on them and . . . apply that to the law." <u>Id.</u> at 7:20-21 (Sullivan).

### 1.    Leon's Treatment.

The United States operates the Acoma-Cañoncito-Laguna Hospital ("ACL") in Acomita, New Mexico under the auspices of the Department of Health and Human Services, Public Health Services, and Indian Health Services. <u>See</u> Memorandum of Law in Support of Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) or, in the Alternative, Motion for Partial Summary Judgment Pursuant to Fed. R. Civ. P. 56 ¶¶ 2, 4, 6, at 2-3, filed October 19, 2006 (Doc. 65)("United States' Memorandum"); Response to Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) or, in the Alternative, Motion for Partial Summary Judgment Pursuant to Fed. R. Civ. P. 56 at 1, filed December 20, 2006 (Doc. 81)("Waconda's Response").  On February 13, 2004, Gloria Leon arrived at the ACL emergency room complaining of a sore throat, body aches, fever, the inability to eat or drink, and difficulty swallowing. <u>See</u> United States' Memorandum ¶ 1, at 2; Waconda's Response ¶ 1, at 2.  Among other conditions, Leon reported that she suffered from

---

[1]The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

diabetes and had a history of cardiomyopathy.  See United States' Memorandum, Exhibit B, Emergency Visit Record at Bates L-182.  During her February 13, 2004 visit, Dr. Aragon treated Leon; Dr. Aragon diagnosed a throat infection, prescribed an antibiotic, and discharged Leon.  See United States' Memorandum ¶ 1, at 2; Waconda's Response ¶ 1, at 2.

The next day, on February 14, 2003, Leon returned to ACL.  See United States' Memorandum ¶ 3, at 2; Waconda's Response ¶ 3, at 3.  Dr. Michael Noce examined her in the facility's ambulatory clinic and diagnosed a throat infection with an additional possible candida infection.  See United States' Memorandum ¶ 3, at 2; Waconda's Response ¶ 3, at 3.  Dr. Noce prescribed a liquid anti-fungal medication and told Leon to return to ACL if her condition worsened.  See United States' Memorandum ¶ 3, at 2; Waconda's Response ¶ 3, at 3.

Leon returned to the ACL emergency room complaining of dehydration on February 17, 2003.  See United States' Memorandum ¶ 5, at 3; Waconda's Response ¶ 5, at 4.  Leon's physical condition reflected a body temperature of 100.5°F, a pulse of 132, a respiratory rate of 62, and an $O_2$ saturation of 89%.  See United States' Memorandum, Exhibit B, Emergency Visit Record at Bates L-188.  During the February 17, 2003 visit, Leon reported that she had been experiencing a cough, shortness of breath, and dizziness for four days, and Leon's husband, Valentine Leon, indicated that she had been exhibiting increasing confusion beginning that day.  See United States' Memorandum ¶ 5, at 3; Waconda's Response ¶ 5, at 4.  Defendant Nanetta Lowe, M.D., examined Leon, heard rhonchi in both lungs, and added pneumonia to Leon's diagnosis.  See United States' Memorandum ¶ 5, at 3; Waconda's Response ¶ 5, at 4.  Dr. Lowe had an ambulance transfer Leon to Defendant St. Vincent Regional Medical Center ("St. Vincent") in Santa Fe, New Mexico.  See United States' Memorandum ¶ 5, at 3; Waconda's Response ¶ 5, at 4.

Defendant Rebecca Bair, M.D., admitted Leon to St. Vincent. <u>See</u> United States'
Memorandum ¶ 7, at 3; Waconda's Response ¶ 7, at 4. Although Leon's blood sugar improved
during her stay at St. Vincent, she continued to have respiratory distress. <u>See</u> United States'
Memorandum, Exhibit F, St. Vincent Hospital Death Summary at 1. While in the process of being
intubated, St. Vincent staff noted that Leon's cardiac rhythm was in ventricular fibrillation and a
resuscitation attempt of over twenty-five minutes was immediately initiated. <u>See</u> <u>id.</u> Leon was
pronounced dead at 6:34 a.m. on February 19, 2003. <u>See</u> <u>id.</u>

   2.   **Relevant Contracts.**

At the time they treated Leon, Dr. Aragon and Dr. Noce were contract physicians working
at ACL pursuant to a contract between Defendant Professional Medical Staffing Associates
("PMSA") and the Public Health Service. <u>See</u> United States' Memorandum ¶¶ 2,4, at 2-3; Transcript
at 9:11-12 (Sullivan); United States' Memorandum, Exhibit G, Contract No. 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
("Contract"). Under the contract, the medical services that PMSA provided were to be performed
as "specified by hospital protocols and procedures[,] and shall be performed by the contractor as an
independent contractor . . . aware of the rules and regulations of the hospital and its medical staff."
Contract, Part C.2.8. PMSA was responsible, however, to indemnify the United States for liability
inducing acts or omissions that PMSA employees or agents performed.

> It is expressly agreed and understood that this is a nonpersonal services contract, as
> defined in Federal Acquisition Regulation (FAR 37.101), under which the
> professional services rendered by the Contractor are rendered in its capacity as an
> independent contractor. [T]he Government may evaluate the quality of professional
> and administrative services provided, but retains no control over professional aspects
> of the services rendered, including by example, the Contractor's professional medical
> judgment, diagnosis, or specific medical treatments. The Contractor shall be solely
> liable for an[d] expressly agrees to indemnify the Government with respect to any
> liability producing acts or omissions by it or by its employees or agents.

Id., Part I.66(a).  The contract also required PMSA to carry liability insurance providing not less than $1,000,000.00 in coverage per occurrence.  See id.

## PROCEDURAL BACKGROUND

Waconda, as personal representative of Leon's estate, filed the operative complaint in this case on June 1, 2006.  See Second Amended Complaint to Recover Damages for Wrongful Death Arising from Medical Negligence, filed June 1, 2006 (Doc. 34)("Complaint").  Waconda's Complaint seeks damages for wrongful death arising from various Defendants' negligent medical treatment of Leon.  See id. ¶¶ 20-41, at 5-8.  Waconda asserts that the Court has jurisdiction over this case pursuant to the Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1) ("FTCA").  See id. ¶ 1, at 1.

The United States contends that, under the FTCA, it is not liable as a matter of law for the negligent acts of a contractor's employees, and therefore "the portion of the complaint and those causes of action based on alleged acts or omissions of Drs. Aragon and Noce should be dismissed." United States' Memorandum at 17.  The United States requests that, in the alternative, the Court grant it partial summary judgment on Waconda's claims based on the alleged acts of Dr. Aragon and Dr. Noce.  See Defendant, United States of America's Reply to Response of Plaintiff to the United States of America's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) or, in the Alternative, Motion for Partial Summary Judgment Pursuant to Fed. R. Civ. P. 56 (Doc. No. 81) at 7-8, filed January 18, 2007 (Doc. 87).  The United States indicates that it is not moving, at this time, for the dismissal of any claims associated with Dr. Lowe's actions or omissions.  See id. at 2 n.1; Transcript at 9:2-4 (Lewis).

Waconda filed her Response in opposition to the United States' motion on December 20, 2006.  On the same day, Dr. Aragon and PMSA filed a response to the United States' motion,

adopting and incorporating Waconda's response.  See Defendants Aragon, MD and PMSA's
Response to the United States of America's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(B)(1)
and 12(B)(6) or in the Alternative for Partial Summary Judgment, filed December 20, 2006 (Doc.
82).

## FEDERAL LAW REGARDING WAIVER OF SOVEREIGN IMMUNITY

The Supreme Court of the United States has read the Congressional language waiving
sovereign immunity in jurisdictional terms.  Unless Congress has waived sovereign immunity, the
federal court does not have jurisdiction over claims against the United States.  Accordingly, to
establish that the federal court has jurisdiction over a claim, the federal court must first decide
whether Congress has waived sovereign immunity.

### 1.      General Principles Regarding Federal Court Jurisdiction.

It is a fundamental precept of American law that the federal courts are "courts of limited
jurisdiction."  Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 552 (2005).  Federal
courts "possess only that power authorized by [the] Constitution and statute."  Kokkonen v.
Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994).  Among the powers that Congress has
bestowed upon the federal courts is the power to hear controversies in which the United States is a
defendant.  See 28 U.S.C. § 1346.

### 2.      Sovereign Immunity and Federal Court Jurisdiction.

The Supreme Court has repeatedly described it as "axiomatic that the United States may not
be sued without its consent" and explained "that the existence of consent is a prerequisite for
jurisdiction."  United States v. Navajo Nation, 537 U.S. 488, 502 (2003)(quoting United States v.
Mitchell, 463 U.S. 206, 212 (1983)).  Because "[s]overeign immunity is jurisdictional in nature . .

. the 'terms of the United States' consent to be sued in any court define that court's jurisdiction to entertain the suit.'" FDIC v. Meyer, 510 U.S. 471, 475 (1994)(quoting United States v. Sherwood, 312 U.S. 584, 586 (1941)(internal brackets omitted)). "The United States consents to be sued only when Congress unequivocally expresses in statutory text its intention to waive the United States' sovereign immunity." United States v. Richman (In re Talbot), 124 F.3d 1201, 1206 (10th Cir. 1997). Any such waiver "must be construed strictly in favor of the sovereign, and not enlarged . . . beyond what the language requires." United States v. Nordic Village Inc., 503 U.S. 30, 34 (1992)(internal quotations and citations omitted).

### 3.    FTCA Contractor Exemption.

In the FTCA, Congress has waived the United States' sovereign immunity in certain civil actions brought against the United States to recover for personal injury or wrongful death:

> [T]he district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b). The Supreme Court has cautioned that the FTCA is a "limited waiver of sovereign immunity," and explained that the Act "defines Government employees to include officers and employees of 'any federal agency' but excludes 'any contractor with the United States.'" United States v. Orleans, 425 U.S. 807, 813-14 (1976)(quoting 28 U.S.C. § 2671). See Woodruff v. Covington, 389 F.3d 1117, 1126 (10th Cir. 2004)("The Supreme Court has emphasized the importance of the 'federal employee' requirement as gatekeeper: 'It is inconceivable that Congress intended to have waiver of sovereign immunity follow congressional largesse and cover countless

unidentifiable classes of beneficiaries.'")(quoting United States v. Orleans, 425 U.S. at 816).

The United States Court of Appeals for the Tenth Circuit has described it as "well settled that the question whether one is an employee of the United States is to be determined by federal law." Lurch v. United States, 719 F.2d 333, 337 (10th Cir. 1983).  See United States v. Seckinger, 397 U.S. 203, 210 (1970)("The validity and construction of contracts through which the United States is exercising its constitutional functions, their consequences on the rights and obligations of the parties, the titles or liens which they create or permit, all present questions of federal law not controlled by the law of any State.")(quoting United States v. County of Allegheny, 322 U.S. 174, 183 (1944)); Ezekiel v. Michel, 66 F.3d 894, 899 (7th Cir. 1995)(holding that determination whether a physician working in a Veteran's Administration hospital "was an employee of the United States for purposes of the FTCA is a question of federal law"); Leone v. United States, 910 F.2d 46, 49 (2d Cir. 1990)("Whether a person is a government employee or an independent contractor is a question of federal law."); Wood v. Standard Products Co., 671 F.2d 825, 829 (4th Cir. 1982)("Whether one is a government employee or an independent contractor under the Act -- a critical question in many FTCA actions such as the present one -- is a question of federal law."); Brooks v. A.R.& S. Enters., Inc., 622 F.2d 8, 10 (1st Cir. 1980)("Whether the United States is liable for the acts of its employees is a question of state law, but whether an individual is an employee of the United States under the FTCA is determined by federal law."); LeFevere v. United States, 362 F.2d 352, 353 (5th Cir. 1966)("Whether a person, whose negligent or wrongful act or omission is said to be the cause of an injury, is a Federal employee, is to be determined by Federal law rather than by the law of the state."); Pattno v. United States, 311 F.2d 604, 605 (10th Cir. 1962)("The States may not decide for the United States who are and who are not Federal employees because the existence of Federal

employment is a Federal question to be answered by application of Federal Law.").  This consensus reflects the Supreme Court's recognition that "Congress . . . could have left the determination as to whose negligence the Government should be liable for under the [FTCA] to the law of the State involved, . . . [b]ut it chose not to do this, and instead incorporated . . . the exemption from liability for injury caused by employees of a contractor."  Logue v. United States, 412 U.S. 521, 528 (1973).

## TENTH CIRCUIT LAW REGARDING WHETHER
## A PHYSICIAN IS A FEDERAL EMPLOYEE

The Supreme Court has emphasized that "[t]he critical determination in distinguishing a federal employee from an independent contractor is the power of the federal government 'to control the detailed physical performance of the contractor.'"  Lilly v. Fieldstone, 876 F.2d 857, 858 (10th Cir. 1989)(quoting Logue v. United States, 412 U.S. at 528).  The Tenth Circuit has instructed that "the key inquiry under this control test is whether the Government supervises the day-to-day operations of the individual."  Lilly v. Fieldstone, 876 F.2d at 858 (quoting Lurch v. United States, 719 F.3d at 337).

The Tenth Circuit has also acknowledged, however, that when the individual subject to analysis is a physician, the court's determination whether the physician is a federal employee or an independent contractor is limited by the recognition  that  "a physician 'must have discretion to care for a patient and may not surrender control over certain medical details.'"  Tsosie v. United States, 452 F.3d 1161, 1163 (10th Cir. 2006)(quoting Lilly v. Fieldstone, 876 F.2d at 859).  See Woodruff v. Covington, 389 F.3d at 1127 ("When it comes to physicians, we have explained that the 'day-to-day control' test may be more difficult to apply.").  Within these limits, and in cases involving physicians, the Tenth Circuit has articulated and repeatedly applied seven factors to guide the court's

determination:

> (1) the intent of the parties; (2) whether the United States controls only the end result or may also control the manner and method of reaching the result; (3) whether the person uses her own equipment or that of the United States; (4) who provides liability insurance; (5) who pays social security tax; (6) whether federal regulations prohibit federal employees from performing such contracts; and (7) whether the individual has authority to subcontract to others.

Tsosie v. United States, 452 F.3d at 1163-64 (quoting Lilly v. Fieldstone, 876 F.2d at 859).  See Woodruff v. Covington, 389 F.3d at 1126-27 (applying seven-factor test in a case involving allegations of medical malpractice against a physician). The application of these factors allow the court to "determine whether other evidence manifests an intent to make the [physician] an employee subject to other forms of control which are permissible." Woodruff v. Covington, 389 F.3d at 1127 (quoting Lilly v. Fieldstone, 876 F.2d at 859).  Finally, "[w]here there is a contract between the government and the physician, clear language regarding government control or 'federal employee' status can often prevail over facts that might otherwise support a finding of 'day-to-day control.'" Woodruff v. Covington, 389 F.3d at 1127.

## STANDARDS FOR DECIDING A MOTION TO DISMISS

Rule 12(b)(1) empowers a court to dismiss a complaint for "lack of jurisdiction over the subject matter." Fed. R. Civ. P. 12(b)(1).  Because subject-matter jurisdiction concerns a court's judicial power to decide a controversy, the parties may not, either unilaterally or by mutual agreement, waive or concede the subject-matter jurisdiction requirement.  See Radil v. Sanborn W. Camps, Inc., 384 F.3d 1220, 1224 (10th Cir. 2004); Laughlin v. Kmart Corp., 50 F.3d 871, 873-74 (10th Cir. 1995).   When subject-matter jurisdiction is proven to be lacking "the only function remaining to the court is that of announcing the fact and dismissing the cause." Steel Co. v. Citizens

for a Better Env't, 523 U.S. 83, 94 (1998)(quoting Ex Parte McCardle, 74 U.S. 506, 514 (1869)).

Once the court has satisfied itself that it has jurisdiction over a controversy, it may entertain motions on the case's merits.  See Bell v. Hood, 327 U.S. 678, 682 (1946)("Whether the complaint states a cause of action on which relief could be granted is a question of law and just as issues of fact it must be decided after and not before the court has assumed jurisdiction over the controversy."). In considering a motion to dismiss a complaint for failure to state a claim under rule 12(b)(6), a court must accept as true all factual allegations in the complaint and must draw all reasonable inferences in the plaintiff's favor.  See Hall v. Bellmon, 935 F.2d 1106, 1109 (10th Cir. 1991).  Where it appears beyond doubt that a plaintiff cannot prove any set of facts that would entitle him to relief, a court may dismiss the cause of action.  See Jojola v. Chavez, 55 F.3d 488, 490 (10th Cir. 1995). The issue is not whether the plaintiff will ultimately prevail, but whether the plaintiff is entitled to offer evidence to support his claim.  See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).

### STANDARD FOR DECIDING SUMMARY JUDGMENT MOTIONS

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  The party seeking summary judgment has an "initial burden to show that there is an absence of evidence to support the nonmoving party's case."  Munoz v. St. Mary-Corwin Hosp., 221 F.3d 1160, 1164 (10th Cir. 2000)(quoting Thomas v. IBM, 48 F.3d 478, 484 (10th Cir. 1995))(internal quotations omitted). Upon meeting that burden, the non-moving party must "identify specific facts that show the existence of a genuine issue of material fact."  Munoz v. St. Mary-Corwin Hosp., 221 F.3d at 1164

(citations and internal quotations omitted).

The opposing party may not rest upon mere allegations and denials in the pleadings, but must set forth specific facts showing that there is a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)(citing Fed. R. Civ. P. 56(e)). An issue of fact is "genuine" if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the non-moving party. Id. at 249-50 (citations omitted). Mere assertions or conjecture as to factual disputes are not enough to survive summary judgment. See Branson v. Price River Coal Co., 853 F.2d 768, 771-72 (10th Cir. 1988).

"The party opposing the motion must present sufficient evidence in specific, factual form for a jury to return a verdict in that party's favor." Id. (citations and internal quotations omitted). The mere existence of a scintilla of evidence in support of the plaintiff's position is not sufficient to avoid summary judgment; there must be evidence on which the fact finder could reasonably find for the plaintiff. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248. The non-moving party must "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Celotex Corp. v. Catrett, 477 U.S. at 324 (internal quotations omitted).

"In a response to a motion for summary judgment, a party cannot rest on ignorance of the facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial." Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Biester v. Midwest Health Servs., Inc., 77 F.3d 1264, 1266 (10th Cir. 1996).

When evaluating a motion for summary judgment, the court examines the factual record and

reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. See Sigmon v. CommunityCare HMO, Inc., 234 F.3d 1121, 1124-25 (10th Cir. 2000).  The court may consider only admissible evidence when ruling on a motion for summary judgment.  See World of Sleep, Inc. v. La-Z-Boy Chair, Co., 756 F.2d 1467, 1474 (10th Cir. 1985)(citing Fed. R. Civ. P. 56(e)).

## ANALYSIS

As a general rule, a motion to dismiss brought under rule 12(b)(1) cannot be converted into a motion for summary judgment under Rule 56.  See Wheeler v. Hurdman, 825 F.2d 257, 259 (10th Cir. 1987).  An exception to this general rule exists, however, "when subject matter jurisdiction is dependent upon the same statute which provides the substantive claim in the case."  Trainor v. Apollo Metal Specialties, Inc., 318 F.3d 976, 978 (10th Cir. 2002).  In this case, "Rule 56 governs because the determination of whether the FTCA excepts the government's actions from its waiver of sovereign immunity involves both jurisdictional and merits issues."  Redmon v. United States, 934 F.2d 1151, 1155 (10th Cir. 1991).

Waconda acknowledges that, in resolving this motion, the Court's task is to "take the facts as [Waconda] and [the United States] agree on them and . . . apply that to the law."  Transcript at 7:20-21 (Sullivan).  Moreover, the distinction between rule 12(b)(1) and rule 56 analysis is immaterial in this case, because a waiver of the United States' immunity is a jurisdictional prerequisite to the Court exercising its judicial power in this case.  If Dr. Aragon and Dr. Noce are not federal employees, the Court need not, for the purposes of the United States' motion, reach the merits of the medical malpractice claims associated with their treatment of Leon.  Because the United States has not, under the FTCA, waived its immunity for torts that independent contractors

-13-

commit, and because Dr. Aragon and Dr. Noce cannot be considered federal employee under the applicable federal law, the Court will grant the United States' motion.

## I.    FEDERAL LAW CONTROLS WHETHER THE PHYSICIANS ARE FEDERAL EMPLOYEES OR INDEPENDENT CONTRACTORS.

Waconda acknowledges that whether Dr. Aragon and Dr. Noce are federal employees or independent contractors is the dispositive question for the purposes of this motion.  See Waconda's Response at 2; Transcript at 10:16-21 (Sullivan)(describing the doctors' employment status as the "initial question").  To resolve  this question, Waconda urges the Court to apply New Mexico law. See Waconda's Response at 6.  Waconda cites Houghland v. Grant, 119 N.M. 422, 891 P.2d 563 (Ct. App. 1995), for the proposition that, under New Mexico law, the United States is liable for the actions of Dr. Aragon and Dr. Noce under a theory of "apparent agency."  Waconda's Response at 8.  Waconda argues that Leon went to the ACL emergency room with the reasonable belief that the emergency room physicians were federal employees and therefore a jury should decide the issue of the doctors' employment status.  See id. at 9.

In Houghland v. Grant, the New Mexico Court of Appeals considered whether a private hospital could be held vicariously liable for malpractice committed by a physician working under a staffing contract through a private, third-party agency.  The Court of Appeals noted that, although the contract between the hospital and the staffing agency designated the physician as an independent contractor, "contractual provisions do not control the determination of whether [the physician] was an employee or an independent contractor."  119 N.M. at 425, 891 P.2d at 566.  The Court of Appeals in Houghland v. Grant explained that "[t]he primary test to determine whether a[n] employer-employee relationship exists is the extent of the employer's right to control the details of

-14-

the work of the employee." Id.  To evaluate the extent of the employer's control, the Court of Appeals enumerated four factors to consider: "(1) direct evidence of the employer's power to control the manner and means of performance of the employee, (2) the method of payment of compensation, (3) whether the employer furnishes equipment for the worker, and (4) whether the employer has the power to terminate the employee at will." Id.

The Court of Appeals in Houghland v. Grant recognized, however, that "[i]n the context of hospital emergency rooms . . . the right to control test is not always the most helpful test . . . [because,] by requiring compliance with its policies and procedures, a hospital may be merely contributing to the maintenance of professional standards, not controlling the physician." Id. at 426, 891 P.2d at 567.  Accordingly, the Court of Appeals considered the theory of "apparent authority" and emphasized that, in its analysis, "[w]e focus on whether to impose liability on [the hospital] for the actions of [the physician] rather than on the strict legal relationship between [the hospital] and [the physician]." Id.  Applying this principal, and citing a number of other state courts from around the nation, the Court of Appeals in Houghland v. Grant joined the "[m]any jurisdictions [that] have considered the issue of apparent authority and have allowed the imposition of liability on hospitals for injuries to patients caused by emergency room doctors who ostensibly were agents of the hospital although employed by separate corporations." Id.

The Court believes that the Court of Appeals' focus in Houghland v. Grant makes Waconda's case distinguishable in important ways.  First, because of the Court's need to establish subject-matter jurisdiction over this case before it can adjudicate the merits, the Court must focus on the legal relationship between ACL and Dr. Aragon and Dr. Noce.  Second, the question the Court of Appeals addressed in Houghland v. Grant is distinct from the one before the Court.  Unlike the Court of

-15-

Appeals in <u>Houghland v. Grant</u>, the Court's task in this case is not to determine whether principles of vicarious liability might otherwise create liability for a private hospital under general theories of tort and agency law, but rather to determine whether, pursuant to the FTCA, Congress has expressly and unequivocally waived the United States' sovereign immunity under these circumstances. Even if the Court were to apply state law at this juncture, because the Court of Appeals did not address the latter issue in <u>Houghland v. Grant</u>, the case would not be controlling.

The more serious flaw in Waconda's argument is that the Tenth Circuit has expressly and consistently considered it "well settled that the question whether one is an employee of the United States is to be determined by federal law." <u>Lurch v. United States</u>, 719 F.2d at 337 (citing <u>Pattno v. United States</u>, 311 F.2d at 605, and cases from the Supreme Court, First Circuit, and Fifth Circuit). In addition, the Tenth Circuit has repeatedly found, in cases involving physicians, that, because of the independence necessary in medical decision making, a wide range of evidence, including the express language of the contractor agreement, may overcome competing circumstances that might otherwise counsel for a finding that a contractor-physician was a federal employee. <u>See</u> <u>Lilly v. Fieldstone</u>, 876 F.2d at 859 ("What we must do in the case of professionals is determine whether other evidence manifests an intent to make the professional an employee subject to other forms of control which are permissible."). The Tenth Circuit has recognized that "[a] myriad of doctors become employees by agreement" and that "[t]he United States is equally capable of making such an arrangement by express, unambiguous agreement." <u>Id.</u>

In <u>Woodruff v. Covington</u>, the Tenth Circuit considered whether physicians who provided health services to Native Americans through a privately organized clinic operating in a federal Indian hospital in Oklahoma City, Oklahoma were federal employees under the FTCA. In addressing the

question without any reference to Oklahoma law, the Tenth Circuit in <u>Woodruff v. Covington</u> began

with the premise that "[a] critical element in distinguishing an agency from a contractor is the power

of the Federal Government 'to control the detailed physical performance of the contractor.'"  389

F.3d at 1126 (quoting <u>United States v. Orleans</u>, 425 U.S. at 814).  To guide its analysis, the Tenth

Circuit referenced the seven factors that it had previously articulated in <u>Lilly v. Fieldstone</u>, but noted

that, "[w]hen it comes to physicians, we have explained that the 'day-to-day control' test may be

more difficult to apply."  <u>Woodruff v. Covington</u>, 389 F.3d at 1127.  To compensate for this

difficulty, the Tenth Circuit explained in <u>Woodruff v. Covington</u>, that "we simply take into account

the doctor's medical and ethical obligations of independent judgment when we apply the traditional

control test."  <u>Id.</u>  The Tenth Circuit also emphasized that, "[w]here there is a contract between the

government and the physician, clear language regarding government control or 'federal employee'

status can often prevail over facts that might otherwise support a finding of 'day-to day control.'"

<u>Id.</u>

>           For example, in <u>Duplan v. Harper</u>, we held that a doctor who provided treatment at
>     an Air Force hospital was an "independent contractor," rather than a "federal
>     employee," because his contract with the government explicitly designated the doctor
>     as an independent contractor, he wore a name tag identifying himself to the patients
>     as a "contract physician," he was paid by a private provider, and the private provider
>     had control and responsibility for liability insurance.  188 F.3d 1195, 1200-02 (10th
>     Cir. 1999).  These facts outweighed other facts indicating that patient records were
>     maintained by the government, the government retained the power to conduct
>     periodic quality reviews of the doctor's performance, the government imposed
>     minimum standards for doctors, the government required doctors to follow certain
>     rules (including a dress code), the government supplied virtually all equipment and
>     support personnel at the clinic, and the government required the doctor to be at the
>     clinic during designated hours.  <u>Id.</u>  Similarly, in <u>Lurch[ v. United States]</u>, 719 F.2d
>     at 338, we held that the contractual language prohibited treating the doctor as a
>     governmental employee.

<u>Woodruff v. Covington</u>, 389 F.3d at 1127-28.  Finally, in finding that the doctor-defendants in

Woodruff v. Covington were not federal employees, the Tenth Circuit emphasized that the party asserting federal-employee status has the burden to demonstrate the FTCA's federal-employee provision applies.  Id. at 1128.

Most recently, less than two years after deciding Woodruff v. Covington, the Tenth Circuit, in Tsosie v. United States, ruled that a physician employed at the Gallup Indian Medical Center in Gallup, New Mexico, pursuant to a non-personal services contract, was not a federal employee for purposes of the FTCA.  See Tsosie v. United States, 452 F.3d at 1162.  In reaching its decision without any reference to New Mexico law, the Tenth Circuit acknowledged the day-to-day control test was applicable to its analysis and used the seven factors it had previously used in Lilly v. Fieldstone and Woodruff v. Covington to conclude that the physician was not a federal employee. See Tsosie v. United States, 452 F.3d at 1163-65.  The Tenth Circuit concluded in Tsosie v. United States that, in the physician-employee context, the physician was not under the United States' control, because "the contract under which [the physician] performed his medical services did not contain mere form 'recitations' attempting to create an independent contractor status, but rather was carefully drafted to ensure that all hallmarks of such a relationship were present," and because "the Lilly[ v. Fieldstone] factors point in favor of independent contractor status." Tsosie v. United States, 452 F.3d 1165.

In sum, the Tenth Circuit has expressly, and by application, instructed district courts to apply federal law in determining whether an individual is a federal employee for the purposes of the FTCA. In the case of medical malpractice actions against physicians working in the United States' hospitals, this analysis entails the application of the day-to-day control test applied through the factors articulated in Lilly v. Fieldstone, combined with a recognition that a physician has medical and

ethical obligations of independent judgment.  To determine whether Dr. Aragon and Dr. Noce are federal employees or independent contractors, and therefore whether the Court has jurisdiction over this matter, the Court will apply federal law, in the manner that the Tenth Circuit has instructed, without reference to New Mexico state law regarding principles of vicarious liability.

## II.    PMSA IS AN INDEPENDENT CONTRACTOR WITH THE UNITED STATES.

At the hearing on this motion, Waconda's counsel conceded that, if the Court were to apply federal law to the jurisdictional issue in this case, and evaluate the employment status of Dr. Aragon and Dr. Noce exclusively under the Tenth Circuit's right-to-control analysis -- without any reference to principles of apparent agency -- then the Court would be compelled to find that it lacked jurisdiction over claims against the United States based on the alleged negligence of Dr. Aragon and Dr. Noce.  See Transcript at 14:7-11 (Sullivan).  Waconda's counsel specifically referred to the Tenth Circuit's decision in Tsosie v. United States and acknowledged that the "case [is] fairly well on point fact wise."  Transcript at 15:13-14 (Sullivan).

Despite Waconda's concession, the Court will separately address each of the factors that the Tenth Circuit has indicated are applicable to its analysis, applying them to the facts in this case. When the Court undertakes such an analysis, the Court is convinced that the physicians are, under federal law, independent contractors and not federal employees.

### A.    THE PARTIES' INTENT.

The United States relies on its contract with PMSA to argue that the United States intended to create an independent contractor relationship.  While the contract that the United States offers the Court may not, alone, establish a contractor relationship, it does go a long way toward establishing independent-contractor status.

-19-

In <u>Tsosie v. United States</u>, the Tenth Circuit found that the language of the contract into which the parties entered reflected an intent to create an independent contractor relationship.  The contract at issue in <u>Tsosie v. United States</u> stated that "[i]t is expressly agreed and understood that this is a nonpersonal services contract . . . under which the professional services rendered by the Contractor are rendered in his capacity as an independent contractor."  452 F.3d at 1164.  The contract also provided that "[t]he Government may evaluate the quality of professional and administrative services provided, but retains no control over professional aspects of the services rendered, including by example, the Contractor's professional medical judgment, diagnosis, or specific medical treatments."  <u>Id.</u>

The contract at issue in this case contains virtually identical language to that which the Tenth Circuit considered in <u>Tsosie v. United States</u>.  Under the contract into which the United States and PMSA entered, the medical services that PMSA provides are to be performed as "specified by hospital protocols and procedures[,] and shall be performed by the contractor as an <u>independent contractor</u> . . . aware of the rules and regulations of the hospital and its medical staff."  Contract, Part C.2.8 (emphasis added).  The contract also states that PMSA's medical services "are rendered in its capacity as an independent contractor," and, although "the [United States] may evaluate the quality of professional and administrative services," the United States "retains no control over professional aspects of the services rendered, including by example, [PMSA's] professional and medical judgment, diagnosis, or specific medical treatments."  <u>Id.</u>, Part I.66(a).  PMSA also agrees to indemnify the United States for the actions of its employees and agents, and to carry liability insurance.  <u>See</u> <u>id.</u>

Waconda argues that contractual provisions through which ACL reserves the right to control

-20-

how "the physicians were to perform their contracts, and in particular, certain supervision, inspection, record-keeping, consultation and treatment program provisions," undermine the contract's express reference to PMSA's independent status and the United States' lack of control. Waconda's Response at 9.  The Tenth Circuit has noted, however, that "being subject to [a] hospital's rules as a condition of staff privileges does <u>not</u> remotely make a private physician an employee of that hospital." <u>Lilly v. Fieldstone</u>, 876 F.2d at 860 (emphasis in original).  See <u>Duplan v. Harper</u>, 188 F.3d at 1200-02 (holding physician was an independent contractor despite being subject to hospital quality control regulations, record-keeping requirements, dress code, and office-hours).  Moreover, the Court notes that "clear language regarding government control or 'federal employee' status can often prevail over facts that might otherwise support a finding of 'day-to day control.'"  <u>Woodruff v. Covington</u>, 389 F.3d at 1127.  Consistent with the unambiguous plain language of the contract into which PMSA and the United States entered, and with Tenth Circuit caselaw, the Court concludes that the parties intended to establish an independent contractor, and not an employer-employee, relationship.

## B.   WHETHER THE UNITED STATES CONTROLS ONLY THE END RESULT OR MAY ALSO CONTROL THE MANNER AND METHOD OF REACHING THE RESULT.

Waconda contends that the contract into which PMSA and the United States entered indicates that the United States retained a substantial and detailed right to control the work of the physicians.  See Waconda's Response at 9.  Waconda emphasizes that, because ACL is a Medicare hospital, Dr. Aragon and Dr. Noce were subject to all federal law, regulations, and requirements applicable to such a facility.  See id.  Waconda acknowledges that the United States' control of Dr. Aragon and Dr. Noce may be limited to the physician's obligation to conform to professional

-21-

standards, but asserts that Dr. Aragon and Dr. Noce were subject to "the maximum amount of supervision and control which would be consistent with the physicians' professional status and medical autonomy." Id. at 10.

The problem with Waconda's argument is that it does not fully credit the Tenth Circuit's repeated recognition that physicians are in a unique position with respect to the application of the right-to-control test. See Tsosie v. United States, 452 F.3d at 1163 ("[W]e recognize that a physician 'must have discretion to care for a patient and may not surrender control over certain medical details.")(internal quotation omitted); Woodruff v. Covington, 389 F.3d at 1127 ("[W]e simply take into account the doctor's medical and ethical obligations of independent judgment when we apply the traditional control test."); Lilly v. Fieldstone, 876 F.2d at 859 ("The 'control' test is subject to a doctor's medical and ethical obligations."); Lurch v. United States, 719 F.2d at 337 ("[I]t seems logical that some modified control test or some different test should apply with respect to physicians."). Indeed, even the New Mexico Court of Appeals in Houghland v. Grant, the case that Waconda argues the Court should apply to resolve this motion, accepts that "[b]y requiring compliance with its policies and procedures, a hospital may be merely contributing to the maintenance of professional standards, not controlling the physician." 119 N.M. at 426, 891 P.2d at 567. In the context of this caselaw, and given that, under the plain language of the contract between the parties and the medical and ethical standards applicable to physicians, Dr. Aragon and Dr. Noce maintained control over medical decision making, the Court does not believe the contractual and regulatory restrictions to which Waconda refers establish the United States' control over the contracted physicians.

The Court concludes that Dr. Aragon and Dr. Noce were not under the day-to-day control or

supervision of the United States, but exercised their independent medical judgment for the care and treatment of Leon.  The Court finds that this second factor counsels in favor of a finding that the physicians were independent contractors and not employees of the United States.

### C.    WHETHER THE PERSON USES HIS OWN EQUIPMENT OR THAT OF THE UNITED STATES.

The United States concedes that Dr. Aragon and Dr. Noce used the United States' property to provide Leon medical treatment.  See United States' Memorandum.  The Tenth Circuit has noted, however, that while this admission favors a finding that the physicians were federal employees, it is not an important factor in the modern medical context.

> Given that [a physician] does not use his own tools or equipment, the third factor favors "employee" status, but unremarkably so: When a physician shows up to work in today's world -- either as an independent contractor or a full-fledged employee -- he no longer is likely to carry all relevant medical instruments in a black satchel. Instead, it is expected that he will make full use of the hospital's physical facilities during the course of his service.

Tsosie v. United States, 452 F.3d at 1164.  The Court agrees that this third factor is not particularly persuasive.  Given the complexity, size, and expense of modern medical technology, it is unrealistic to expect an individual physician to provide personally all the equipment he may need in an emergency room setting.  Moreover, the Court notes that use of such tools, and the interpretation of the information the tools provide, remains within the control of the physician rendering a diagnosis, and the treatment remains based on that physician's judgment.  In any case, the Court does not believe the fact that the United States owns the equipment that doctors providing medical services at ACL use is a significant factor counseling for a finding that Dr. Aragon and Dr. Noce were federal employees at the time they treated Leon.

D.     WHO PROVIDES LIABILITY INSURANCE.

The contract into which PMSA and the United States entered requires PMSA to indemnify the United States for the liability produced by acts and omissions of PMSA's employees or agents, and requires PMSA to carry liability insurance providing not less than $1,000,000.00 in coverage per occurrence. See Contract, Part I.66(a). Waconda does not dispute that PMSA was required to provide liability insurance, but contends that the risk-shifting provisions of the contract between the PHS and PMSA are inapposite under the controlling state law. See Waconda's Response at 10. Waconda argues that Leon and her family did not have notice of these risk-shifting provisions, and that, under Houghland v. Grant, the appearance that the treating physicians worked for the federal government trumped any unknown characterization of the physician's status as independent contractors, and any indemnity provision that may transfer liability from the United States or its apparent agents. See Waconda's Response at 10-11.

The Court has already held that Waconda's reference to state law is inapplicable in this case. The Court's task is not to determine whether the United States might theoretically be subject to vicarious liability under state tort law, but to determine whether Congress has waived the federal government's sovereign immunity under the circumstances of this case. The answer to that question depends on whether Dr. Aragon and Dr. Noce were federal employees at the time they treated Leon. That PMSA provided liability insurance and indemnified the United States for the physicians' actions is a factor that strongly suggests the physicians were not federal employees, but rather were independent contractors.

E.     WHO PAYS SOCIAL SECURITY TAX.

The United States notes that all payments for services rendered under the contract were made

-24-

directly to PMSA; ACL did not directly pay any physicians that PMSA provided, but rather paid PMSA following documentation of hours worked that PMSA submitted.  See United States' Memorandum at 14.  Moreover, the contract into which the parties entered indicates that the contract price is inclusive of all taxes.  See Contract, Part B.2.  This factor also supports a finding that the physicians are independent contractors, not federal employees.

### F.    WHETHER FEDERAL REGULATIONS PROHIBIT FEDERAL EMPLOYEES FROM PERFORMING SUCH CONTRACTS.

Waconda does not argue that federal regulations prohibit federal employees from performing the services for which the United States contracted with PMSA, and the Court is not aware of any such regulations.  The Court agrees with the United States that, implicit in the Tenth Circuit's holdings regarding physician-contractors, the United States retains the discretion to have its employees perform emergency medical services.  See United States' Memorandum at 15.  In any case, the Court does not believe that, because the United States may choose to contract this work to private third-parties, especially in remote parts of a large, rural state like New Mexico, this factor points strongly in either direction.

### G.    WHETHER THE INDIVIDUAL HAS AUTHORITY TO SUBCONTRACT TO OTHERS.

The United States asserts that PMSA has the authority to subcontract with others.  See United States' Memorandum at 15.  The United States contends that Dr. Aragon and Dr. Noce were either employees or subcontractors of PMSA at the time they treated Leon.  See id.  In Tsosie v. United States, the Tenth Circuit held that this seventh factor counsels in favor of the United States when the contractor has the right to subcontract with others.  See 452 F.3d at 1164.  Because Waconda does not argue that PMSA did not have the ability to subcontract with others, the Court concludes that this

factor weighs in favor of a finding that Dr. Aragon and Dr. Noce were independent contractors.

In sum, after weighing each of the factors that the Tenth Circuit has indicated are applicable to the Court's analysis under the FTCA, the Court concludes that the United States did not maintain the right to control the physicians at issue to an extent sufficient to undermine their alleged status as independent contractors. Consistent with these findings, with Tenth Circuit caselaw, and with Waconda's admission that federal law compels a finding that Dr. Aragon and Dr. Noce are not federal employees, the Court concludes that Waconda has not established a genuine issue of material fact regarding whether the Court has jurisdiction over this matter. The Court will grant summary judgment in the United States' favor on Waconda's claims arising out of the actions of Dr. Aragon and Dr. Noce.

**IT IS ORDERED** that the United States' Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6) or, in the Alternative, Motion for Partial Summary Judgment Pursuant to Fed. R. Civ. P. 56 is granted. The Plaintiff's claims against the United States based on the alleged negligence of Joseph Aragon, M.D., and Michael Noce, M.D., are dismissed.

_____
UNITED STATES DISTRICT JUDGE

-26-

*Counsel:*

Pia D. Salazar
Patrick W. Sullivan
Salazar & Sullivan
Albuquerque, New Mexico

> *Attorneys for the Plaintiff*

Larry Gomez
  Acting United States Attorney
Virgil H. Lewis II
  Assistant United States Attorney
Albuquerque, New Mexico

> *Attorneys for Defendant United States of America*

Lorri Krehbiel
Krehbiel Law Office
Albuquerque, New Mexico

> *Attorneys for Defendant Rebecca Bair, M.D.*

Edward W. Shepherd
Hatch, Allen & Shepherd
Albuquerque, New Mexico

> *Attorneys for Defendant Avelina Bardwell, M.D.*

Melvin R. Beitler
Timothy D. Bergstrom
Beitler Law Firm, P.A.
Albuquerque, New Mexico

> *Attorneys for Defendants Joseph Aragon, M.D.*
>   *and Professional Medical Staffing Associates*
>   *d/b/a PMSA*